## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT LANCASTER and MAXWELL STINSON, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>AGILIS ENGINEERING, INC.; BELCAN LLC; CYIENT, INC.; PARAMETRIC SOLUTIONS, INC.; QUEST GLOBAL SERVICES-NA, INC.; AND RAYTHEON TECHNOLOGIES CORPORATION, PRATT AND WHITNEY DIVISION,<br><br>*Defendants.* | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Robert Lancaster and Maxwell Stinson ("Plaintiffs"), on behalf of themselves and all those similarly situated, bring this antitrust action against Agilis Engineering, Inc. ("Agilis"), Belcan LLC ("Belcan"), Cyient, Inc. ("Cyient"), Parametric Solutions, Inc. ("Parametric"), QuEST Global Services-Na, Inc. ("QuEST") (collectively, the "Supplier Defendants"), and Raytheon Technologies Corporation, Pratt and Whitney Division ("Pratt and Whitney," and collectively with the Supplier Defendants, "Defendants"), seeking treble damages under Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3) and demanding a trial by jury of all issues so triable, allege as follows, based upon personal knowledge as to matters relating to themselves, and upon information and belief and the investigation of counsel as to all other matters:

1

## NATURE OF THE ACTION

1.      This is an antirust class action brought on behalf of a proposed Class (defined *infra*) of engineers and other high skilled workers in the aerospace industry whose wages were suppressed by Defendants' agreement to restrict hiring or "poaching" of one another's high skilled workforce (the "No Poach Agreement"). In a related criminal proceeding, the Department of Justice ("DOJ") characterized the Defendants' No Poach Agreement—which was in place from at least 2011 through 2019—as having "undermined the careers of [Defendants'] own workers in order to reap undeserved profits and deprive our fellow citizens of opportunities to earn a competitive wage," causing "thousands of workers [to be] victimized." The Defendants' own characterization of the No Poach Agreement confirms its purpose and effect: their "general aim [wa]s NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce gets unstable, and our margins all get hurt." Defendants' own words also confirm that, but for their No Poach Agreement, competition for high skilled workers would "drive the[ir] price structure up" causing "salaries to increase." Plaintiffs seek to recover damages, trebled, flowing from the Defendants' No Poach Agreement.

2.      Defendants are aerospace engineering firms. All Defendants employ aerospace, mechanical, and civil engineers and other high skilled workers, such as, but not limited to, engineering technicians, instrumentation technicians, quality technicians, machinists, welders, and mechanics (collectively, "Skilled Aerospace Workers"). Pratt and Whitney performs aerospace engineering projects inhouse, but also outsources significant volumes of aerospace engineering projects to other aerospace engineering firms ("Outsource Aerospace Engineering Projects"). The Supplier Defendants all employed Skilled Aerospace Workers to perform Outsource Aerospace Engineering Projects for Pratt and Whitney. Defendants all shared a common interest in suppressing the mobility, and in turn, the compensation of, Skilled

Aerospace Workers through the No Poach Agreement, but Pratt and Whitney also reaped a unique financial benefit: by suppressing compensation of Skilled Aerospace Workers, Pratt and Whitney also paid the Supplier Defendants less for Outsource Aerospace Engineering Projects than they would have paid if the Supplier Defendants had competitive cost structures. As a result, Pratt and Whitney, through its former Director of Global Engineering Sourcing, Mahesh Patel, took a central role in monitoring and enforcing the No Poach Agreement, including threatening to cut off Supplier Defendants from receiving future Outsource Aerospace Engineering Projects if they did not adhere to the No Poach Agreement.

3.     Federal courts and regulators have consistently concluded that arrangements like Defendants' No Poach Agreement are unlawful *per se* under the Sherman Act. A 2016 guidance issued by the DOJ and Federal Trade Commission states that "[n]aked wage-fixing or no poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal under the antitrust laws." As with any other *per se* violation of the antitrust laws, this is true "even if [the employers] are motivated by a desire to reduce costs." More recent guidance from the DOJ in 2019 explains that such an agreement "[r]ob[s] employees of labor market competition" and "deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment." Indeed, at least some Defendants were cautioned that their conduct was illegal, but they persisted nonetheless.

4.     The No Poach Agreement was orchestrated and enforced through private communications and at private meetings at the highest levels of Defendants' corporate organizations. Defendants attempted, and succeeded, in concealing the existence of the No Poach Agreement from High Skilled Workers, including instructions to "not go[] into detail in writing on th[e] subject" of their No Poach Agreement. The No Poach Agreement was hidden from the

public until the DOJ announced the indictment of Pratt and Whitney's Mahesh Patel on December 9, 2021, which was the first of six indictments in the DOJ's ongoing investigation into criminal antitrust violations affecting Skilled Aerospace Workers.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises under Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

6.      This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22), Federal Rule of Civil Procedure 4(h)(1)(A), and Conn. Gen. Stat. §52-59b.

7.      Defendants are subject to the jurisdiction of this court by virtue of their nationwide contacts and other activities, as well as their substantial contacts with the forum state, including actions in furtherance of the conspiracy alleged herein.

8.      Defendants, directly or through their agents, subsidiaries, affiliates, or parents may be found in and transact business in the forum state.

9.      Defendants, directly or through their agents, engage in interstate commerce the performance and solicitation of performance of Outsource Aerospace Engineering Projects and the employment of Skilled Aerospace Workers.

10.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391, as a substantial part of the acts, omissions, or affected interstate commerce giving rise to the claims set forth herein occurred in this District, and one or more Defendants reside in or maintain facilities in this District.

## INTERSTATE COMMERCE

11.     During the Class Period (defined *infra*), Defendants employed Plaintiffs and other members of the proposed Class across numerous states and territories, including significant presences in at least Connecticut, Georgia, Florida, Illinois, Kentucky, Massachusetts, Puerto Rico, and Vermont, and elsewhere in the United States.

12.     Defendants and states compete to attract Skilled Aerospace Workers and Outsource Aerospace Engineering Projects, causing employment in the industry to cross state lines.

13.     Competition for Skilled Aerospace Workers is nationwide. Defendants considered each other's wages to be competitively relevant regardless of location and many Class members were prevented by Defendants' scheme from moving between states to pursue employment.

14.     Defendants' conduct substantially affected interstate commerce and caused antitrust injury throughout the United States, its territories, and the District of Columbia by restricting the interstate movement of Skilled Aerospace Workers.

## PARTIES AND ALLEGED CO-CONSPIRATORS

15.     Plaintiff Robert Lancaster was employed by QuEST in Rockford, Illinois as an Associate Engineer from December 2018 up through August 2021. Mr. Lancaster was injured in his business and property by reason of the No Poach Agreement alleged herein.

16.     Plaintiff Maxwell Stinson was employed by QuEST in St. Petersburg, Florida as a Project Engineer – Test Technician from August 2020 up through March 2021. Mr. Stinson was injured in his business and property by reason of the No Poach Agreement alleged herein.

17.     Defendant Agilis is a Florida corporation with its headquarters in Palm Beach Gardens, Florida. Agilis performs Outsource Aerospace Engineering Projects for Pratt and Whitney, employs Skilled Aerospace Workers to perform the same, competes with other suppliers for

Outsource Aerospace Engineering Project contracts, and (except as limited by the No Poach Agreement) competes to hire Skilled Aerospace Workers.

18.     Defendant Belcan is an Ohio a limited liability company with its headquarters in Cincinnati, Ohio and an office in Windsor, Connecticut. Belcan performs Outsource Aerospace Engineering Projects for Pratt and Whitney, employs Skilled Aerospace Workers to perform the same, competes for Outsource Aerospace Engineering Project contracts, and (except as limited by the No Poach Agreement) competes to hire Skilled Aerospace Workers.

19.     Defendant Cyient is a California corporation with its United States headquarters in East Hartford, Connecticut. Formerly known as Infotech Enterprises Limited, Cyient underwent a name change and re-branding in 2014. Cyient performs Outsource Aerospace Engineering Projects for Pratt and Whitney, employs Skilled Aerospace Workers to perform the same, competes for Outsource Aerospace Engineering Project contracts, and (except as limited by the No Poach Agreement) competes to hire Skilled Aerospace Workers.

20.     Defendant Parametric is a Florida corporation with a principal place of business in Jupiter, Florida. Parametric performs Outsource Aerospace Engineering Projects for Pratt and Whitney, employs Skilled Aerospace Workers to perform the same, competes for Outsource Aerospace Engineering Project contracts, and (except as limited by the No Poach Agreement) competes to hire Skilled Aerospace Workers.

21.     Defendant QuEST is an Ohio corporation with an office in East Hartford, Connecticut. QuEST performs Outsource Aerospace Engineering Projects for Pratt and Whitney, employs Skilled Aerospace Workers to perform the same, competes for Outsource Aerospace Engineering Project contracts, and (except as limited by the No Poach Agreement) competes to hire Skilled Aerospace Workers.

22.     Defendant Pratt and Whitney is a company incorporated in Delaware with its headquarters in East Hartford, Connecticut. Pratt and Whitney contracts with the Supplier Defendants and other aerospace companies to perform Outsource Aerospace Engineering Projects, employs Skilled Aerospace Workers, and (except as limited by the No Poach Agreement), competes to hire Skilled Aerospace Workers.

23.     Mahesh Patel ("Patel") was the Manager and Director of the Global Engineering Sourcing unit within Pratt and Whitney. He worked at Pratt and Whitney as early as 2003, and left the company in March 2020. During the events alleged herein, he worked principally from an office in East Hartford, Connecticut. Patel played a central role in the orchestration and enforcement of the No Poach Agreement. Patel has been criminally indicted by the DOJ for his role in victimizing thousands of Skilled Aerospace Workers through the No Poach Agreement. He left Pratt and Whitney in March 2020.

24.     Bob Harvey ("Harvey") is the President and Global Business Head of QuEST. He has worked at QuEST since 2010 and has held positions including Senior Vice President of QuEST's Strategic Account Management organization and as of 2019, President-Global Business Head. During the events alleged herein, Harvey worked principally from an office in East Hartford, Connecticut. Harvey played a central role in the orchestration and enforcement of the No Poach Agreement. Harvey has been criminally indicted by the DOJ for his role in victimizing thousands of Skilled Aerospace Workers through the No Poach Agreement.

25.     Harpreet Wasan ("Wasan") was a QuEST Vice President/Strategic Client Partner, and during the events alleged herein worked principally from QuEST offices in East Hartford, Connecticut and Tokyo, Japan. Wasan was employed by QuEST as early as 2015 and left QuEST in early 2021. Prior to his employment with QuEST, Wasan worked for Pratt and

Whitney for approximately a decade. Wasan played a central role in the orchestration and enforcement of the No Poach Agreement. Wasan has been criminally indicted by the DOJ for his role in victimizing thousands of Skilled Aerospace Workers through the No Poach Agreement.

26.    Steven Houghtaling ("Houghtaling") is the Senior Vice President at Belcan and has previously held positions of Vice President and General Manager. Houghtaling was employed by Belcan as early as 2013. During the events alleged herein he operated principally from an office in Windsor, Connecticut. Houghtaling played a central role in the orchestration and enforcement of the No Poach Agreement. Houghtaling has been criminally indicted by the DOJ for his role in victimizing thousands of Skilled Aerospace Workers through the No Poach Agreement.

27.    Tom Edwards ("Edwards") is the President of Cyient's North America operations and has been employed by Cyient at least as early as 2010. During the events alleged herein he operated principally from an office in East Hartford, Connecticut. Edwards played a central role in the orchestration and enforcement of the No Poach Agreement. Edwards has been criminally indicted by the DOJ for his role in victimizing thousands of Skilled Aerospace Workers through the No Poach Agreement.

28.    Frank O'Neill ("O'Neill") founded Agilis in 1993, and is a part owner of the company, and has held the titles of President, Chief Executive Officer, and Director. O'Neill played a central role in the orchestration and enforcement of the No Poach Agreement.

29.    Gary Prus ("Prus") is the Chief Operating Officer, Executive Vice President, and part owner of Parametric, dating back to 2015. Prus played a central role in the orchestration and enforcement of the No Poach Agreement. Prus has been criminally indicted by the DOJ for his role in victimizing thousands of Skilled Aerospace Workers through the No Poach Agreement.

30.    Various other individuals and entities not named as defendants herein participated as co-

conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy ("Co-Conspirators"). Each Defendant or Co-Conspirator acted as the principal of or agent for the others. When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, it is to be understood that Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the companies within that family.

## CLASS ACTION ALLEGATIONS

31.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) as representatives of a Class defined as follow:

> All Skilled Aerospace Workers employed by Defendants in the United States, its territories, and the District of Columbia at any time from the period beginning January 1, 2011 and concluding at such time as the effects of Defendants' No Poach Agreement ceased (the "Class Period").

> Excluded from the Class are members of Defendants' board of directors and senior level executives that orchestrated and enforced the No Poach Agreement, including Patel, Harvey, Edwards, Wasan, Prus, O'Neill, and Houghtaling.

32.     The Class is so numerous that joinder is impractical. The DOJ has stated that the No Poach Agreement victimized thousands of Skilled Aerospace Workers.

33.     The Class is ascertainable based on objective criteria that can be identified either from Defendants' records or through self-identification in the claims process.

34.     Plaintiffs' claims are typical of those of the Class.

35.     Plaintiffs and all members of the Class were injured by the same unlawful conduct, which resulted in all of them having fewer employment opportunities and earning lower compensation than they would have in a competitive market during the Class Period.

36.     Plaintiffs will fairly and adequately protect and represent the interests of Class. The interests of the Plaintiffs are not antagonistic to the Class.

37.     Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to the Class members.

38.     Questions of law and fact common to the Class include:

(1)     Whether Defendants' No Poach Agreement constitutes a contract, combination, or conspiracy under Sections 1 and 3 of the Sherman Act;

(2)     Whether Defendants' No Poach Agreement suppressed Skilled Aerospace Workers' compensation below competitive levels; and

(3)     The proper measure of damages.

39.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust and unfair competition litigation.

40.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

## FACTUAL BACKGROUND

### Aerospace Firms and Outsource Aerospace Engineering Project Suppliers

41.     Skilled Aerospace Workers help to design, fabricate, and manufacture, *inter alia*, aircraft (including airplanes, helicopters, and fighter aircraft), spacecraft, satellites, and missile systems.

42.     Skilled Aerospace Workers are employed by companies that design, fabricate, and manufacture, *inter alia*, aircraft (including airplanes, helicopters, and fighter aircraft), spacecraft, satellites, and missile systems ("Aerospace Firms"). This includes employment by Aerospace Firms that perform work on Outsource Aerospace Engineering Projects. All Aerospace Firms—whether they perform Outsource Aerospace Engineering Projects or not—compete for the same pool of Skilled Aerospace Workers on a nationwide basis.

43.     There are currently 69,600 aerospace engineers in the United States, its territories, and the District of Columbia and tens of thousands of additional Skilled Aerospace Workers including, without limitation, mechanical and civil engineers, engineering technicians, instrumentation technicians, quality technicians, machinists, welders, and mechanics.

44.     Pratt and Whitney develops aircraft engines for civil and military aviation. Pratt and Whitney's engines are used in commercial aircraft such as the Airbus A320 and the Boeing 777.

45.     Pratt and Whitney also supplies engines for military aircraft, including the F-35 Lightning II, the F-22 Raptor, and the C-17 Globemaster III.

46.     For various reasons, including the ability to realize cost advantages and utilize resources on an as-needed basis, Pratt and Whitney contracts with other Aerospace Firms like the Supplier Defendants to perform Outsource Aerospace Engineering Projects. In an Outsource Aerospace Engineering Project, another Aerospace Firm will contract with Pratt and Whitney and offer its own Skilled Aerospace Workers to provide services within the applicable statement of work.

**The Relevant Market**

47.     Plaintiffs disclaim the need to plead a relevant market for its antitrust claims because no-poach agreements are *per se* illegal under federal antitrust laws. In a similar situation concerning a conspiracy to limit competition for labor, the DOJ remarked that "No-Poach Agreements

eliminate competition in the same irredeemable way as a customer- or market-allocation agreement, and the department has long prosecuted such agreements as hardcore cartel conduct." Competitive Impact Statement, *US v. Knorr-Bremse AG and Westinghouse Air Brake Technologies*, 1 :18-cv-00747 (D.D.C. April 3, 2018).

48.    To the extent that a relevant market needs to be defined, it is the employment market for Skilled Aerospace Workers in the United States, its territories, and the District of Columbia.

49.    Skilled Aerospace Workers have highly specialized skills. Engineers must obtain graduate or undergraduate level degrees, often specific to aerospace engineering. Aerospace welders often require certifications and other training specific to the aerospace field. Aerospace instrumentation technicians often have an undergraduate degree or technical degree and have significant training and experience to be considered for any jobs and promotions. The aerospace application of the skill sets required of Skilled Aerospace Workers are not directly transferable to other fields. Moreover, the Skilled Aerospace Workers market is characterized by high entry barriers, including substantial investments of time and money in obtaining education, training, and experience, which in turn constitute barriers to exit once they have been obtained.

50.    As such, Skilled Aerospace Workers would not turn to employment outside of the aerospace industry if a hypothetical monopolist imposed a significant non-transitory decrease in compensation and Defendants have the ability to profitably suppress compensation to Skilled Aerospace Workers without losing a sufficiently high number of Skilled Aerospace Workers to jobs in other fields such as would defeat the economic effects of the pay suppression. This in turn demonstrates that Defendants possess market power in the relevant market.

**DEFENDANTS' ANTICOMPETITIVE SCHEME**

51.     Beginning at least as early as 2011, Pratt and Whitney orchestrated the No Poach Agreement to prevent the free movement of Skilled Aerospace Workers among Defendants. The No Poach Agreement was implemented in at least three mutually reinforcing ways. First, outright restrictions on the hiring of one another's Skilled Aerospace Workers. Second, hiring freezes and related restrictions directed at Skilled Aerospace Workers. And third, the collusive enforcement of non-compete provisions in Skilled Aerospace Workers' employment contracts.

52.     Pratt and Whitney employed Skilled Aerospace Workers and also entered into Outsource Aerospace Engineering Projects with the Supplier Defendants. If labor costs increased due to increased wages or benefits to Skilled Aerospace Workers, Pratt and Whitney felt those effects not only in its own labor costs, but in the Supplier Defendants' labor costs that were passed on to Pratt and Whitney through Outsource Aerospace Engineering Project contracts.

53.     To mitigate the financial effects of free competition for Skilled Aerospace Workers on the Defendants' bottom line, Defendants agreed to restrict the free movement of each other's Skilled Aerospace Workers. The restrictions served no legitimate business purpose, but rather, as Prus wrote, served their interest in "not want[ing] the salaries to increase."

54.     Patel served as the chief architect and enforcer of the No Poach Agreement. There was an explicit agreement among the Defendants not to poach employees. When Cyient attempted to hire an employee from QuEST, the hiring prompted a QuEST representative to email Patel and say, **"This is against our agreements with our employees and against our known expectations of [Pratt and Whitney] for the cooperation of the outsource companies."** (Emphasis added). The next day, executives from Cyient and QuEST in question were invited to a meeting in Patel's office for a "private discussion."

55.    Upon information and belief, Patel made several explicit statements to Supplier Defendants not to poach each other's employees, including the following:

a.    In or around December 2015, a dinner was attended by representatives of QuEST, Belcan, and Cyient, as well as Co-Conspirators Patel, Wasan, and Edwards. An executive at QuEST sent an email to Houghtaling summarizing the dinner and stated that "Mahesh did take the stage at the end. . . no poaching of each others' [sic] employees."

b.    In or around November 2016, Belcan attempted to actively recruit from Parametric, prompting Patel to send a message to Houghtaling stating, "[w]e must not poach each other [sic] partners [sic] employee [sic]. Please communicate to [Belcan] HR not to interview or hire active employees working on [Pratt and Whitney] work."

c.    In January of 2017, Patel sent an email to a Prus stating that "[l]ast time we talked you assured me that you will not hire any [Pratt and Whitney] partners employee. This must stop, otherwise others will also start poaching your employees."

d.    In a January 2017 email, after learning that Parametric had poached an employee of Cyient, Patel contacted a representative of Parametric to say "[p]lease do not hire any partners [sic] employee, whether they approached or you approached [them]."

56.    Indeed, Patel served as the enforcer of the No Poach Agreement and would be the individual that would listen and act on the grievances brought before him by the Supplier Defendants. For example, in May 2016, when a Belcan employee was hired by Parametric, an employee of Belcan sent an internal email to Houghtaling asking if Houghtaling had discussed the poaching "with Mahesh," to which Houghtaling responded "[y]es, he said he'd talk to [Parametric] about it." Houghtaling then followed up with an email to Patel to let Patel know that Belcan was "losing another employee to [Parametric]."

57.     In another example, sometime in or around February 2017, when Belcan made an offer to a QuEST engineer, Wasan—whose responsibilities included speaking with Patel when to enforce the No Poach Agreement—stated that "[Belcan] is not allowed to poach any of our employees and I will plan to block this immediately. I will send this to Mahesh today." He then emailed Patel and said, "I am very concerned that [Belcan] believes they can hire any of our employees. . . . Could you please stop this person from being hired by [Belcan]?"

58.     When the representatives took their grievances to Patel, he was able to enforce the agreement and ensure that no poaching occurred. For example, when Belcan informed Patel that Parametric was attempting to poach Belcan's employees, Patel wrote to Prus stating "You had assured me that [Parametric] will never soliciting [sic] [Pratt and Whitney's] long term partners [sic] employees. . . .  Please send me in writing that proper steps has [sic] taken place to curtail this practice." Prus then gave instructions to a Parametric employee to "[p]lease stop speaking to any [Belcan] or other [Pratt and Whitney] supplier companies about transitioning to a [Parametric] Office immediately" to which another Parametric employee responded, "[c]onsider it done."

59.     When Patel enforced the No Poach Agreement, he would often remind the Supplier Defendants of the consequences of free competition they were seeking to avoid as he did, for example, in a message to a Parametric employee (copying Prus) in or around January 2017 stating: "[p]lease do not hire any partners [sic] employee, whether they approached or you approached. That is the only way we can pre[v]ent poaching and price war."

60.     When Patel could not succeed in appealing to the Defendants' common benefit in maintaining the agreement, he would resort to a blunter tool of enforcement—the threat of terminating business between Pratt and Whitney and any Supplier Defendant that cheated on the

No Poach Agreement. In June 2018, for example, Belcan had made an offer to an engineer that worked at QuEST, which resulted in a series of email exchanges between representatives at Belcan and Patel. A recruiter at Belcan wrote in an email that "[QuEST] complained to [Pratt and Whitney] that we are 'stealing' their people, and [Pratt and Whitney] threatened to pull all POs from [Belcan] if we hire him." In response to Patel's threat, a day later, an employee for Belcan emailed Patel and said, "[p]er our conversation yesterday, this email is to confirm that we have rescinded the offer letter" to the engineer from QuEST.

61.     Given the tools available to enforce the agreement, the Supplier Defendants took great efforts to monitor and comply with their illegal No Poach Agreement. For example, sometime in or around February 2015, Edwards—Cyient's President for North America operations—became aware that Cyient had hired an employee of QuEST. Edwards emailed another executive within Cyient stating "I let Mahesh know that this happened – [a]nd we are still looking into how exactly this happened." Edwards then asks the executive "can you let Mahesh know the actions we're taking to prevent this from happening again?"

62.     In or around November 2016, Prus wrote to another executive at Parametric stating the "[n]eed to have a conversation with [a manager at Belcan] about them actively recruiting [Parametric] employees. We do not EVER call their employees." The Parametric executive responded to Prus that: "I talked to him. He will talk to recruiting."

63.     In or around 2017, a Vice President from QuEST emailed Houghtaling, at Belcan, after Belcan reportedly made offers of employment to two QuEST engineers and stated "I would like to understand if you are planning to address this immediately, or I will be forced to escalate to our mutual customers." In response, Harvey added that the message was "Spot on. This cannot be tolerated! We need to move quickly and forcibly when this is about to happen." Later, Harvey

added, when speaking to QuEST's management and executive team: "Push hard to have it reversed and consequences for [Belcan]."

64.    Supplier Defendants also conversed among themselves to remind each other about why the No Poach Agreement existed. In or around September 2019, for example, Edwards had learned that Agilis had hired four of Cyient's employees, prompting Edwards to message O'Neill, the President of Agilis, to quit "actively recruiting" engineers from Cyient. O'Neill wrote back that his "general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get unstable, and our margins all get hurt." Edwards replied back that "I flat out ask our teams not to hire people from the other [Pratt and Whitney] suppliers."

65.    Indeed, it was precisely because their agreement was a means of improving the Defendants' financial situation that they decided to ignore the obvious legal liability. As early as 2016, Houghtaling was alerted to information about a civil lawsuit where major technology companies were (as the person forwarding phrased it): "engaging in illegal anti-poaching agreements . . . the companies involved had promised each other not to actively recruit employees from one another." Just days later, Houghtaling worked with another employee at Belcan to set up a meeting with Patel in which one of the agenda items was to discuss "[i]nformal poaching agreement between outsource suppliers. Recent Apple lawsuit because these agreements are illegal." Despite this meeting, Defendants' illegal conduct continued.

66.    In 2017, Defendants' conduct's illegality was again openly discussed. Houghtaling wrote to Belcan's Human Resources Director and indicated that this agreement was something "[Pratt and Whitney] (Mahesh Patel) is asking (insisting) that we not interview anyone currently employed by our competitors . . . I'm not sure if this is legal, but that is what they are requesting

we do." Belcan's Human Resources Director met with Patel to discuss her concerns with this anticompetitive agreement, and then reported that she "spoke with Mahesh this afternoon. He understands our concern with antitrust compliance, however, he still requested that our recruiters not speak with applicants who are current[ly] employed with [Belcan] competitors."

67.    To reinforce the No Poach Agreement, Pratt and Whitney and QuEST also communicated about and implemented hiring freezes and other formal restrictions pertaining to the employment of Skilled Aerospace Workers. This served to memorialize the No Poach Agreement into specific and formal corporate policies.

68.    In 2011, Harvey, President and Global Business Head of QuEST, worked with a colleague to institute an arrangement whereby Pratt and Whitney would not hire any of QuEST's Skilled Aerospace Workers and vice versa. At a dinner that year, Patel, another Vice President at Pratt and Whitney, and Harvey discussed a "new policy/guideline" related to a "min. 24 months" for "personnel transfers" between the two companies.

69.    After that, from time to time, the two companies communicated about and continued to maintain and enforce the restriction. As an example, in October 2012, it was requested that Patel not hire a QuEST engineer because the "[Employee]'s tenure at [QuEST] dates to May 2011. Based on our agreement of two year minimum tenure, we would ask that [Pratt and Whitney] not pursue employment of [him] at this time."

70.    To further the No Poach Agreement, for certain periods between 2015 and 2017, Pratt and Whitney and QuEST also communicated about formal policies to forgo hiring one another's Skilled Aerospace Workers irrespective of any question of minimum tenure.

71.    For example, in September 2015, Patel sought concurrence from QuEST to hire two engineers from QuEST. Harvey replied and pushed back on Patel's request by stating "Mahesh,

we truly need your help in blocking these two hires and putting a moratorium on [QuEST] hires for the remainder of the year."

72.     In another example, Wasan wrote to a colleague that, "I am planning to meet with Mahesh later this week to discuss the hiring matrix I developed to limit the hiring. Also I am going to tell him that he needs to block" certain QuEST Skilled Aerospace Workers "from being hired until we come to an agreement on the acceptable limit to hire [from] our team."

73.     Patel made sure that Pratt and Whitney executives were aware of the hiring freeze so that they would abide by them. Patel emailed a Vice President of Human Resources at Pratt and Whitney and told her to "direct your HR team not to hire [QuEST] outsource resources currently deployed on [Pratt and Whitney] projects till end of this year. . . . [QuEST] senior leadership including CEO has repeatedly raised concerns on [Pratt and Whitney] hiring [QuEST] employees. We will lift [QuEST] hiring restriction from Jan 1, 2018."

74.     The hiring freezes goals were clear from the beginning, as indicated in a presentation sent by Harvey, President and Global Business Head of QuEST, that "customer hiring of our resources puts pressure on [QuEST]'s and our customers' ability to contain labor cost increases in our joint 'ecosystem' over time."

75.     As further evidence of the No Poach Agreement, Parametric insisted that its Skilled Aerospace Workers enter into overly restrictive non-compete arrangements.

76.     These non-compete arrangements purported to restrict employees' mobility after leaving Parametric by prohibiting such employees from gaining employment for two years following departure from any company that Parametric did business with in the two years prior to departure. Parametric also included a list of employers for which employees could not work after leaving Parametric during the two-year term of the non-compete agreement.

77.    When an employee gave Parametric notice that the employee was leaving the company, Parametric would demand to know where the employee was going to work. At that time, Parametric typically provided the departing employee with a list of employers for which the employee was purportedly prohibited from working. This list was broad in scope and changed over time. Parametric then threatened legal action if the employee began working for one of the companies on the list.

78.    Conspicuously, Defendants were ***not*** on the list of restricted companies, indicating that there was no need for their inclusion because the No Poach Agreement already prevented Skilled Aerospace Workers from leaving Parametric for other Defendants' employment.

### Plus Factors in the Industry that Make Collusion More Likely

79.    In addition to the extensive record of direct evidence of the No Poach Agreement among Defendants, there are several plus factors that demonstrate why the market for Skilled Aerospace Workers in susceptible to collusion, including (1) numerous opportunities to collude; (2) entry and exit barriers; and (3) a common motive to conspire.

80.    *Opportunities to Collude.* Defendants had a very close personal relationship, offering numerous opportunities to collude. As discussed above, Defendants had direct lines of communications with each other, which involved emails, phone conversations, and even in-person meetings where the subject was the conspiracy itself.

81.    In an effort to maintain even closer ties, Defendants worked with each other to locate offices near each other. In or around 2017, Pratt and Whitney worked closely with Belcan, QuEST, and Cyient for those companies to open offices in Middletown, Connecticut to be near Pratt and Whitney's headquarters.

82.    Further, these companies worked to integrate their businesses. In or around 2014, for

example, QuEST integrated the India based supply chain unit of Pratt and Whitney into its engineering services arm, offering a closer working relationship between the two.

83.    There were also events, hosted by Pratt and Whitney, where Defendants were able to get together and further facilitate the No Poach Agreement. For example, Pratt and Whitney hosts an annual "Supplier Summit" where it offers awards in various categories to its suppliers. In 2019, Cyient won the "Supplier Innovation Award" and the "Supplier Highest Productivity Award," because, as Cyient boasted, it was able to deliver "cost savings".

84.    *Barriers to Entry and Exit*. There are barriers to entry for Aerospace Firms and barriers to entry and exit for Skilled Aerospace Workers. Skilled Aerospace Workers must make substantial investments of time and money into their education and training to acquire the highly specialized skill necessary to perform the work required by Aerospace Firms. Many positions offered by Defendants, for example, require a minimum of a bachelor's degree in a related field.

85.    Once a Skilled Aerospace Worker has been trained and obtains gainful employment, the employee faces a high barrier to exit. Opportunities for advancement and higher paying jobs become contingent on the length of time the Skilled Aerospace Worker has been in the field and the type of specialized experience the Skilled Aerospace Worker has accrued. Because of the specialization in aerospace that Skilled Aerospace Workers receive based on their time in the field, their skills are not directly transferable to other fields. Thus, Skilled Aerospace Workers become less likely to transfer to a different role.

86.    *Common Motive to Conspire*. Given that many of the Supplier Defendants bid against each other for work, all companies have an incentive to keep labor costs low. Defendants do not poach from each other because, as they admit, they want to suppress wages. In Patel's words, Defendants would "not hire any partners [sic] employee, whether they approached or you

approached" because "[t]hat is the only way we can pre[v]ent poaching and price war." O'Neill stated that his "general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get unstable, and our margins all get hurt." And Harvey explained in a presentation that poaching "puts pressure on [QuEST]'s and our customers' ability to contain labor cost increases in our joint 'ecosystem' over time."

87.     Pratt and Whitney's motivation is two-fold. By enforcing the No Poach Agreement, it ensures that the Supplier Defendants are able to keep labor costs down, and that higher labor costs are not passed on to Pratt and Whitney when it hires Supplier Defendants to perform Outsource Aerospace Engineering Projects.

88.     Moreover, Pratt and Whitney bids on contracts with the federal government and with commercial entities to provide engines for various civil and military aircraft. The ability to keep labor costs low is an important facet in ensuring that Pratt and Whitney can submit bids that secure lucrative contracts.

89.     Relatedly, the Supplier Defendants have an incentive to ensure that Pratt and Whitney can submit bids with the government and other commercial entities because their work with Pratt and Whitney is dependent on Pratt and Whitney winning contracts to supply engines. They are aware that lower costs assist Pratt and Whitney to secure lucrative contracts.

**<u>Anticompetitive Effects and Injury Suffered by Class Members</u>**

90.     The DOJ has stated that "no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws."

91.     In terms of labor, Defendants compete with each other for Skilled Aerospace Workers. Given the demand for specialized services, Aerospace Firms that are behaving competitively often seek to identify, solicit, and recruit these employees. In addition to directly applying to a

firm, Skilled Aerospace Workers may work with a recruiter to identify potential jobs that fit their

skillset. The ability of an employee to seek employment at other firms, either by directly

applying or working with a recruiter, allows the employee to learn about additional job

opportunities, learn about the market compensation rates, and, ultimately, give those employees

more information to better assess whether to stay at their current job or leave. Transparent

information about the job market for Skilled Aerospace Workers allows those Skilled Aerospace

Workers to switch employers that offer a more competitive pay, or to negotiate a better salary

with their current employer. In a competitive market, such transparency and ability to entertain

offers from other companies would have led to higher wages. However, the Defendants' No

Poach Agreement prevented Skilled Aerospace Workers from obtaining transparent information

about potential job opportunities or the job market.

92.     The Defendants' No Poach Agreement not only affected the Skilled Aerospace Workers

that were the subject of the No Poach Agreement between Defendants, it affected all Skilled

Aerospace Workers in the aerospace industry and kept wages below levels that would have

existed but for the existence of the Defendants' No Poach Agreement.

## PLAINTIFFS' CLAIMS ARE TIMELY

93.     Defendants fraudulently concealed the operation and existence of their conspiracy.

Accordingly, the statute of limitations application to Plaintiffs' claims have been tolled.

94.     Defendants actively concealed, suppressed and failed to disclose facts to Plaintiffs or

members of the Class concerning the existence of the illegal conduct perpetrated by Defendants.

95.     Defendants were even instructed to limit how much they wrote of their agreement,

presumably to limit the evidence. As Harvey stated in a September 2011 email: "[f]ollowing

Mahesh's [Patel's] previous counsel, I am not going into detail in writing on this subject."

96.    Similarly, in or around January 2015, a QuEST manager was recounting a discussion with Houghtaling about ceasing poaching between QuEST and Belcan and stated his desire to Harvey and other QuEST executives that the communications be kept private: "While I wanted you to be informed, I would rather not have any other folks know where this info came from. I request that this email not be forwarded."

97.    Furthermore, public statements and materials available by several Defendants misled employees and the public that these companies were adhering to the antitrust laws. For example:

- Raytheon Technologies Corporation, the parent company of Pratt and Whitney, states in its Code of Conduct that "anti-competitive activities are always a violation of our values."

- QuEST's Code of Conduct states that "anti-competitive activity will not be tolerated."

- Belcan's Code of Conduct "requires and expects everyone to conduct business fairly, impartially, and in full compliance with all laws and regulations."

- Cyient's Code of Conduct states that "Directors and Senior Management personnel shall avoid actions that could reasonably be construed as being anti-competitive, monopolistic or otherwise contrary to laws governing competitive practices in the marketplace, including antitrust laws."

98.    Additionally, communications occurred through direct contact of senior executives at these companies with the understanding that they were not to go "into detail in writing on this subject" concerning their criminally illegal conduct. As such, there is no conceivable way Plaintiffs or the members of the Class, through the exercise of reasonable diligence, could have gained knowledge of the conspiratorial conduct undertaken by Defendants any earlier than

December 9, 2021, the date the DOJ's criminal investigation was first publicly revealed.

99.     As a result of the Defendants' conduct, the running of any statute of limitations has been tolled with respect to the claims that Plaintiffs and the Class members allege herein.

100.     The effects of Defendants' anticompetitive conduct are continuing. Plaintiffs and members of the Class are entitled to recover damages suffered within the applicable limitation periods.

## COUNT ONE

### Agreement in Restraint of Trade in Violation of Sections 1 and 3 of the Sherman Act

101.     Plaintiffs incorporate each allegation above as if fully set forth herein.

102.     Defendants' No Poach Agreement is an unlawful contract, combination, or conspiracy in restraint of trade, in violation of 15 U.S.C. §§ 1 and 3.

103.     Defendants' scheme injured Plaintiffs and other members of the Class by suppressing their compensation and depriving them of free and fair competition in the market for their services.

104.     The scheme also restricted the interstate movement of workers between various states and territories, including at least Connecticut, Georgia, Florida, Illinois, Kentucky, Massachusetts, Puerto Rico, and Vermont, and elsewhere in the United States.

105.     There are no procompetitive justifications for Defendants' No Poach Agreement, or if there are, they are outweighed by the anticompetitive effects of the same and, in any event, could be achieved through less restrictive means.

106.     The No Poach Agreement is a *per se* violation of the Sherman Act.

### PETITION FOR RELIEF

WHEREFORE, Plaintiffs petition for the following relief:

A.      A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiffs be appointed as class representatives, and that Plaintiffs' counsel be appointed as class counsel;

B.      A determination that the conduct set forth herein is unlawful under Sections 1 and 3 of the Sherman Act;

C.      A judgment and order requiring Defendants to pay damages to Plaintiffs and the members of the Class, trebled;

D.      An order enjoining Defendants from engaging in further unlawful conduct;

E.      An award of attorneys' fees and costs;

F.      An award of pre- and post-judgment interest on all amounts awarded; and

G.      Such other and further relief as the Court deems just and equitable.

## REQUEST FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs request a trial by jury of all claims alleged herein so triable.

Dated: January 11, 2022             Respectfully submitted,

*/s/ William M. Bloss*
William M. Bloss
Bar No.: CT01008
KOSKOFF, KOSKOFF & BIEDER, P.C.
350 Fairfield Avenue
Bridgeport, CT 06604
(203) 366-4421
bbloss@koskoff.com

Bonny Sweeney*
HAUSFELD LLP
600 Montgomery St. #3200
San Francisco, CA 94111
(415) 633-1908
bsweeney@hausfeld.com

Hilary K. Scherrer*
HAUSFELD LLP
888 16th Street NW, Suite 300
Washington, DC 20006
(202) 540-7200
hscherrer@hausfeld.com

Gary I. Smith, Jr.*
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
(215) 985-3270
gsmith@hausfeld.com

Joshua H. Grabar*
GRABAR LAW OFFICE
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
(267) 507-6085
jgrabar@grabarlaw.com

Marc H. Edelson*
EDELSON LECHTZIN LLP
3 Terry Drive, Suite 205
Newtown, PA 18940
(215) 867-2399
medelson@edelsonlaw.com

*Attorneys for Plaintiffs and the Class*

* *Pro hac vice* application forthcoming